Green J.
delivered the opinion of the court.
By the several bills and answers, and the proof in these causes, it appears that Ferrell Belcher, previous to the year 1820, resided in Twiggs county in the State of Georgia, was a thriving farmer, owning several tracts of land and eight negroes. He had only two children, both of whom were sons, Wiley and Allen. Wiley was elected sheriff of Twiggs county in 1820, and when that appointment expired, he was in 1S22, elected clerk of the same county. In both of these offices Allen was his deputy. By these offices Wiloy made money, to a considerable amount. The money thus made was put into the hands of Ferrell, the father, who laid it out in the purchase of negroes, taking title to himself.
*124 In the fall of 1824, Ferrell Belcher purchased of John Walker a tract of land of six hundred and forty acres, in Marion county, Tennessee, for $5000, for which he executed five several notes for $1C00 each, with his son Wiley for his security; the first payment to be made in 1826, and the others in each successive year thereafter. Ferrell removed to Tennessee and resided on the land purchased from Walker. He also became owner of a house and lot in Jasper, and of several other tracts of land in M arion county. Previous to 1829, both the sons had married, and Wiley lived in the house in Jasper, and kept tavern, and Allen resided on the plantation with the old man. The tavern was supplied with provisions principally fiom the plantation.
On the 10th of January, 1829, Ferrell Belcher conveyed by deed of gift twenty-one negioes, by name, to Wiley, leaving only six undisposed of; he also, at the same time made Wiley a deed for the Walker tract of land, expressing a consideration of $1000. Previous to this time Ferrell had become addimed to drunkenness, and had been at the house of Wiley from the 24th of December preceding, till the time the deeds were made; during all this time he had access to spirituous liquors and was in a greater or less degree of intoxication. But on various occasions afterwards, he declared that Wiley ought to have the property, that he had been instrumental in acquiring it, and that he should not die with a good conscience, unless Wiley obtained it. Wiley was an industrious, intelligent, thrifty man. Allen was honest, high-minded, but he had an irritable temper, and when excited was a dangerous man. About the time these deeds to Wiley were made. Allen procured a deed from his father for the house and lot in Jasper, four negroes, and probably other property. He was exceedingly dissatisfied with Wiley for obtaining bis deeds and threatened violence to bis brother and to the negroes, unless the deeds were given up. Ferrell was alarmed, unless Allen should do Wiley or the negroes some injury, and solicited Wiley to do something to pacify him. The brothers had an interview, the father being present, in which Allen demanded that the deeds should be surrendered. Wiley refused to do this, and they parted in an *125 ger. In a day or two afterwards they met again, and it was agreed that they should both burn their deeds, and let the old man make a will. In pursuance of this agreement they 1. . ^ both professed to throw their deeds in the lire. Wiley, however, retained his, and burned copies only. This was about 15th January. After this Ferrell Belcher made several wills, the last one of which, dated 2d day of March, 1829, gave all his property, real and personal, after payment of debts, to his wife for life, and after her death he devised it to his sons. To Wiley he gave two houses and lots in Jasper, purchased from Arnett, 219 acres of land bought fi-om Coul-~ ter, fifteen negroes by name, the southern half of the Walker tract, containing 320 acres, two tracts in Twiggs county, Georgia, containing 2021 acres each, and his cotton gin in Jasper. To Allen 320 ¡teres of land, (he northern half of the Walker tract, twelve negroes by name, 490 acres of land in Erwin county, and 490 acres in Wayne county, Georgia, and the household and kitchen furniture, and hogs. The horses, cattle and growing crop were equally divided between them, and they were required to contribute equally to the payment of his debts, and especially the debt to Walker. Two days after the execution of this will Ferrell Belcher died. During the life time of Ferrell the two notes to Walker, which were first due were paid, and the sum of $441 93 cts. had been paid on the third. Suits had been brought up on the third and fourth notes against Wiley alone; and Allen, after the deeds had been burned, by cousent of the counsel who managed the causes for Walker, signed these notes and had his name inserted in the proceedings as a defendant. At the May sessions of the county court the suits were revived against Allen and Wiley, as executors of Ferrell, and the August session judgments were entered against them on the third note, for $589 12 cents, debt and damages, and $12 02 cents costs; and on the 4thnote for $1076 66 cents, debt and damages, and $12 02 cents costs. On 12th October, 1829, they joined in filing a bill of injunction against Walker, on account of an adverse claim, which had been set up ejectment against Allen, who was in possession. Allen then removed to Georgia, and afterwards, on the 12th day *126 1830, judgment was rendered against him and Wiley, on the 5th note, for $1115 50 cents, and on the 14th of that month he died. Old Mrs. Belcher also died in the same month, having until then retained the possession of the property devised to Allen. William Crocker, attorney in fact for Allen, being at her house when she died, took possession with the knowledge and consent of Wiley, of Alien's half of the Walker land, as devised in the will, and also of the negroes devised to him, among whom were seven of those that had been conveyed by the deed of the 10th January, 1820, to Wiley. These negroes were placed in the hands of Alexander Coulter that they might be in reach of the execution on the Walker judgments and be applied to the satisfaction of Allen’s half of that judgment. The negroes which were devised to Allen, and which were not conveyed to Wiley, were kept out of the way, and the executions were levied on the seven, who had been included in Wiley’s deed. Wiley forbid the sale, and exhibited for the first time since the agreement to burn them, his deed of gift for these negroes. The sale however took place, and five of the ne-groes were bid off for William Crocker, the father of Allen’s widow.
At the August term, 1830, of the Marion county court, the will was produced and offered for probate, and Wiley filed a caveat, but afterwards withdrew it, and the will was proved and recorded; neither Wiley nor Allen, nor W. J. Standifer, who were named as executors, have ever qualified as such, nor has administration been granted with the will annexed. Wiley agreed that Crocker should take into his possession the negroes that were devised to Allen, and they went together and offered the Walker tract of land for sale. Wiley proposed to sell the half devised to him, and Crocker the half that was devised to Allen. Wiley also took the part of the horses, cattle and growing crop, which was devised to him in the will, he also sold a house and lot in Jasper, which was devised to him in the will, but which had been conveyed to Allen by the deed he had destroyed. In December, 1830, Wiley filed his bill to set up his deeds against Allen’s representatives and William Crocker. Allen’s renresentatives also *127 filed their bill to have the deeds of Wiley set aside and can-J celled, and the property decreed to them. Both causes were heard together, and a decree was made in favor of Allen’s representatives, and Wiley’s bill was dismissed. An appeal was prayed and granted, but the appellant failing to give bond and security in the time limited, bis appeal was at a former term dismissed. A petition was filed for a certio-rari', to bring up the cause to be beard in this court, as upon an appeal. This motion has been continued several terms, and now the question is, shall the artiorari be granted. The reason why the security was not given, is deemed sufficient.; two weeks were allowed by the chancellor within which the security might be given. One of the counsel wrote to the appellant by mail on the day the decree was pronounced, or the day afterwards, informing him of the result of the causes, and what he was required to do. The letter did not come to hand till several days after the time limited for giving the bond had expired.
The next question is, whether the applicant for the certiorari, Wiley Belcher, has merits in his cause? As the whole record is before us, after a very full and able argument cn both sides, we will examine the questions as they arise in the order of the transactions. 1st. It is insisted by the representatives of Allen Belcher, that Wiley Belcher committed a fraud, in obtaining his father’s signature to his deeds. This position is attempted to be supported upon the ground, that the deeds gave Wiley much more than half the estate the old man possessed in disregard of the equal claims which Allen had on their father’s bounty, and that Ferril was induced to execute them when drunk by the fraudulent contrivance of Wiley. These allegations were not supported by the evidence' in the cause. Although it is true that the old man was addicted to drunkenness, and was most probable to some extent intoxicated, when he executed the deeds, yet the proof is satisfactory, that he was not in a condition to he insensible of what he was doing. He was certainly not in a situation to exercise a very sound discretion; still we are satisfied that in this instance, he did what he deliberately desired to do. Many witnesses on both sides testify to the old man’s frequent declaration, that Wiley ought *128 to have the property, and that he would not be content unless that disposition were made of it. If there had been no other ground for this wish, than mere caprice, still the old man bad a right to act with bis property as be chose. If Wiley made use of no undue means to procure the deeds, the mere fact that his father regarded him with the most favor, and was disposed to give him the larger portion of .his estate, furnishes no ground of objection to the transaction, although he was in some degree intoxicated, for there is not the slightest proof that Wiley used any contrivance or management to draw him into drink, or that he took any unfair advantage of his state of intoxication to obtain the deeds. To authorize the court to set aside a contract, merely on the ground that the party making it was drunk, it must appear that the drunkenness was excessive, so that the party was utterly deprived of the use of his reason and understanding. Story’s Eq. 235. It is proper also to add, that the old man in speaking of his desire that Wiley should have this property, frequently gave as a reason, that the means by which it was obtained, were contributed to a considerable extent by him. This fact having been also established by other proof, repels the presumption of fraud, and furnishes a reasonable ground for his father’s preference.
The next inquiry is, did Wiley commit a fraud in making the agreement to burn his deeds, and then by failing to comply and burning copies only, induced Allen to burn his deed. We cannot resist the conclusion that he did. A very ingenious argument is .made by the counsel to justify him for the deception which he practised, but to bold that the end sanctifies the means is exceedingly unsound in morals and dangerous in practice. The law, as well as the Bible, enjoins that a man should “speak the truth in his heart;” he must neither tell a falsehood, nor by any action practice a deception on his fellow man to his injury. It is true, Allen’s conduct in threatening his brother and distressing his Father was highly reprehensible, nor would there have been any ground of equity against Wiley, if he had openly refused to carry into execution the agreement which had been obtained from him. For in that case he would have received no benefit, nor *129 would Allen have sustained any iriury, and therefore no con- . . 4 J J J * sideration would have existed, upon which to enforce agreement. But by pretending to comply with the agreement on his part, he induced Allen to comply in good faith and to burn his deed. Now it is easy to see, that Allen was placed in a much worse situation by the destruction of his deed, than he would have been in had he retained it. If he had retained his deed, the property conveyed to him would have been no more subject to the debts .of his father than that conveyed to Wiley. If the property of the one had been sold by the creditors of his father, the other would have been bound to contribute his proportion of the amount of such debt. But by the destruction of Allen’s deed, the whole of the debts aro thrown upon that portion of the pi operty which had been conveyed to him. Wiley would be liable to pay nothing, until a'.í the old.man’s property, not included in his deed should be exhausted, therefore, instead of being liable for half the debts, as he would have been, had Allen retained his deed, Wiley, by inducing its destruction, is exempted from the payment of a dollar, and Allen, even should his father die intestate, is saddled with the whole of his debts-, instead of the proportion he would have been liable to pay had he retained his deed.
Whether contribution in such a case would be enforced or not, cannot affect the force of the argument. For we aró unable to see from the facts in the cause, which deed was first executed. Mary E., the widow of Allen, says that Wiley’s was first executed; and Wiley in his answer says, that he heard the deed to Allen was made before the execution of bis deeds. If in such case there would be no contribution, then, as Wiley was a co-obligor in the notes to Walker, and was alone sued, he would have been compelled to pay the entire debt, and if as he says Allen’s deed was oldest, he would have been exempted from the payment of any part Thus, instead of being liable to pay the whole Walker debt, had Aden retained his deed, by procuring its destruction, the liabilities are changed, and the property of Allen, had his father died intestate, would have been liable for the whole. There is another view of this transaction, in *130 which the injury is still more manifest. By the destruction of Allen’s deed, his father became revested with the title to the whole of the property which he had conveyed to him, and being thus vested with the title, he had a right to dispose of it as he pleased. lie might convey it to another, or devise it to others, if he thought proper, and Allen would have no right to complain of him, or of his subsequent donee or devisee. True, he had been induced to give it up, bj a deceptious artifice, but neither the old man, nor his subsequent donee, could have been chargeable with it. It would have been a complete loss to him, in consequence of the destruction of his deed, and that destruction produced by the-artful and false pretence of Wiley, that he had also destroyed his deeds. It is no answer to the foregoing view of the case to say, that these evils have not in fact come upon Allen. The character of Wiley’s conduct is to be judged of by an examination of what would have been the legitimate legal consequences of that conduct. It is said Wiley has in fact paid half the debts, and this appears from the evidence-fo be-true. But why did he pay any part of them? No one will pretend that he was bound to pay a dollar, if his conduct about burning the deeds were innocent. If his deeds are not vitiated'by his agreement to burn them, and the deception he practised on Allen, the property conveyed by them cannot be rendered liable to the old man’s debt, while there remains other property unconsumed. If, therefore, Wiley has paid half the debt to Walker, as he paid it as the old man’s security only, should his deeds now be declared valid, he may yet collect the whole of it from that part of the old man’s estate which wTas not conveyed to him. What is to prevent him? I know of no principle of law or equity that could interpose against him. It must be seen, therefore, that Allen is deeply injured, or which is the same thing, is exposed to injury by the contrivance and deception of Wiley.
But it is asked, what benefit the destruction of Wiley’s deeds would have been to Allen? It would have vested the property in the old man, and there, would have been a possibility that he might die intestate, or by will devise part of it so Allen. But this, it is said, he had no right to claim of *131 his father, and therefore it did not necessarily follow, that he would be benefited by the destruction of Wiley’s deeds. In answer to this it is enough to say, that it would have placed them on equal footing. By again placing his own property at the disposition of his father, Allen was risking all without the possibility of gaining any thing. Had Wiley’s deeds been destroyed, he would have had the prospect of benefit, either by a devise from his father, or by his dying intestate. But in truth, the agreement to destroy the deeds, that the old man might make a will, was made at the instance of the father, in order that a disposition of the property more favorable to Allen might be made. This promise to provide for him by will, and Wiley’s agreement to burn his deeds constitute the reason why Allen’s was destroyed, and therefore Wiley’s refusal was directly injurious to Allen. If so, he is guilty of fraud. Fraud, in the sense of a court of equity, properly includes all acts, omissions, and concealments, which involve a breach of either legal or equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue or unconscientious advantage is taken of another. 1 Fonb. Eq. b 1, c 263, (note 8): 2 Vez. 155, 156: 1 Story’s Eq. 197.
It may be safely assumed, that Wiley was guilty of a concealment in violation of a confidence justly reposed, by which an undue advantage is obtained over Allen. He induced his brother-by his deception to part with property to which be was entitled, without any corre?ponding benefit, and himself was thereby relieved from the legal duty of paying half bis father’s debts, for which he was otherwise liable. He-deceived his father, and induced him to devise property he had before conveyed to Allen, to himself, the testator making provision for Allen, by devising property, which is now claimed by these deeds. True, the counsel in the argument of this cause, say the court may make Wiley account for the house and lot, crop, &c. which he has received and appropriated under the will, and thus place (he parties in stain quo. But Wiley’s answer holds a very 'different language. He insists the house and lot were paid for with property that was his own, and therefore, that the house' and lot were his, *132 and that for this reason he ought to hold them. But if it possible to do so, this is not a case where the court r # 7 can act upon the rights of the parties, and place them in slatu quo. Either Wiley is guilty of a fraud, or he is not. If no fraud has been committed, there is no ground for relief against him. But if he be guilty of a fraud, then clearly he ought not to obtain the benefit of his fraud, as though he were innocent. Entertaining this view of the facts of the case, the legal consequence is, that Wiley’s deeds must be cancelled and rendered wholly void. For a court of equity considers as done, what ought to have been done. It will not only interfere in cases of fraud, to set aside acts done, but will also, if by fraud acts have been prevented from being done by the parties, interfere and treat the case exactly as if the acts had been done. 1 Jac. & Walk, 96: 1 Story’s Eq. 198. As the opinion of the court, upon the question of fraud, settles the rights of the parties, it is unnecessary to discuss the question, whether the subsequent acts of Wiley, in reference to the property devised by the will, are such as would estop him from claiming by virtue of his deeds. Several of these acts, such as joining Alien’s agent in ofieiing the land for sale, and giving up to him, or consenting that he should take possession of the seven negroes that had been given to himself by the deed, are inconsistent with the existence of a title in himself for the samo property, and we are strongly inclined to think would constitute an estoppel to his present claim. Law Lib. Part. 147, mar. page: 4 Kent’s Com. 261, 3d edit, note (d) and the authorities there cited.
The court is of opinion, that the petitioner, Wiley Bel-cher, has shown no ground for relief in this court, and that his application for a certiorari be refused and that the decree of the chancery court be in all things affirmed.
Decree affirmed.